**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

EDWARD LEWANDOWSKI,         )     CASE NO. 1:18CV530
                               )
        Plaintiff,            )
                               )
        v.                 )     MAGISTRATE JUDGE
                               )     JONATHAN D. GREENBERG
NANCY A. BERRYHILL,          )
        Acting Commissioner     )
        of Social Security,        )     **MEMORANDUM OF OPINION**
                               )     **AND ORDER**
        Defendant.         )

Plaintiff, Edward Lewandowski ("Plaintiff" or "Lewandowski"), challenges the final

decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security

("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C.

§ 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

# I.  PROCEDURAL HISTORY

Lewandowski filed an application for POD and DIB in November 2014, and an application for SSI in March 2015.  (Transcript ("Tr.") at 10.)  He alleged a disability onset date of April 15, 2014 and claimed he was disabled due to prostate cancer, stage 1; depression; enlarged lymph nodes; orchitis; and epididymitis.  (Tr. at 10, 238, 245, 267.)  The applications were denied initially and upon reconsideration, and Lewandowski requested a hearing before an administrative law judge ("ALJ").  (Tr. 10, 188-191, 193-197, 200.)

On September 9, 2016, an ALJ held a hearing, during which Lewandowski, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 121-148.)  On April 5, 2017, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 10-27.)  The ALJ's decision became final on January 8, 2018, when the Appeals Council declined further review.  (Tr. 1-6.)

On March 7, 2018, Lewandowski filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14.)  Lewandowski asserts the following assignment of error:

> (1)     The ALJ erred at Step Five of the sequential evaluation, in concluding that Plaintiff is capable of light work.  Specifically, the ALJ did [not] properly evaluate Plaintiff's need for a cane, or his well-established upper extremity limitations.  Additionally, the ALJ failed to properly consider the opinion of both treating and consultative physicians.

(Doc. No. 12 at 7.)

# II.  EVIDENCE

## A.     Personal and Vocational Evidence

Lewandowski was born in July 1962 and was fifty-four (54) years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations. (Tr. 21.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). He has at least a high school education and is able to communicate in English. (*Id.*) He has past relevant work as a centrifugal casting machine tender and material handler. (*Id.*)

## B.    Relevant Medical Evidence[2]

The record reflects Lewandowski was diagnosed with prostrate cancer in March 2014 and underwent a robotic laparascopic retropubic radical prostatectomy and bilateral total lymphadenectomy in May 2014. (Tr. 345-357.) Treatment records indicate he was subsequently treated for infection accompanied by abdominal pain and cramping. (Tr. 338-340, 332-334, 313-320.)

On September 26, 2014, Lewandowski presented to Ryan Berglund, M.D., for evaluation of right lower quadrant and right testis pain. (Tr. 309-312.) Examination revealed normal spinal range of motion, intact muscular strength, no joint swelling or tenderness, normal extremities, and no edema. (Tr. 311.) Dr. Berglund also noted, however, that Lewandowski was "very tender" in his right epidydimis. (*Id.*) He diagnosed right epydimitis and prescribed Levaquin, Tramadol, and Tylenol. (Tr. 312.)

Lewandowski presented to his primary care physician, William Boros, M.D., on October 10 and 27, 2014. (Tr. 306-309.) On both occasions, he complained of abdominal pain radiating

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Moreover, because Lewandowski's assignments of error relate solely to his physical impairments, the Court will not discuss the medical evidence relating to his mental impairments.

to his lower extremities. (Tr. 308, 306.) Examination findings were normal, aside from tenderness in Lewandowski's lower quadrant. (Tr. 309, 307.) Dr. Boros ordered a CT scan of his abdomen and pelvis. (Tr. 307.)

On November 15, 2014, Lewandowski presented to the emergency room ("ER") with complaints of right lower abdomen pain radiating to his groin and lower back. (Tr. 301-304.) Examination revealed mild generalized abdominal tenderness, bilateral testicular tenderness, and bilateral lumbar paraspinal tenderness. (Tr. 303.) Lewandowski was diagnosed with abdominal and testicular pain, prescribed pain medication, and discharged home in improved and stable condition. (Tr. 303.)

Several days later, on November 18, 2014, Lewandowski established care with Helen Rizi, M.D. (Tr. 485-494.) He complained of lower abdominal pain, which he rated a 6 on a scale of 10. (Tr. 485.) Lewandowski also reported groin pain, lower back pain, and chronic, worsening knee pain. (Tr. 490.) Dr. Rizi's treatment note indicates a CT scan and ultrasound from his ER visit were both normal. (*Id.*) On examination, she noted tenderness to palpation in Lewandowski's abdomen. (Tr. 491.) Dr. Rizi continued him on his medications. (Tr. 491-492.)

On December 18, 2014, Lewandowski presented to physician assistant Victoria Lipnickey, P.A., with complaints of continuing groin and testicular pain. (Tr. 469-474.) Ms. Lipnickey assessed epididymitis and recommended this condition be treated aggressively. (Tr. 473.) She ordered gentamycin injections (which Lewandowski underwent that day and the following day) and a month long course of antibiotics. (Tr. 473, 465-468.)

Lewandowski returned to Ms. Lipnickey the following month, on January 29, 2015. (Tr. 616-621.) He reported significant improvement after his injections, but stated the pain had

returned.  (Tr. 616.)  Examination revealed no abdominal tenderness, minimal tenderness in Lewandowski's testes, and no edema.  (Tr. 619.)  Ms. Lipnickey prescribed a three week course of antibiotics and ordered a testicular ultrasound.  (Tr. 620.)

On February 10, 2015, Lewandowski returned to Dr. Rizi with complaints of sharp, aching knee pain, which he rated a 7 on a scale of 10.  (Tr. 609.)  On examination, Dr. Rizi noted Lewandowski appeared to be in pain when walking.  (Tr. 613.)  She ordered x-rays of his knees and lumbar spine, advised him to lose weight, and continued him on his medications.  (Tr. 613-614.)  Lewandowski underwent the x-rays on February 25, 2015.  (Tr. 550-551.)  Both were normal.[3]  (*Id.*)  It appears Lewandowski underwent an additional battery of x-rays two days later, on February 27, 2015.  (Tr. 565-568.)  These x-rays (of his lumbar spine and bilateral knees) were also normal.  (*Id.*)

On February 20, 2015, Lewandowski presented to psychiatrist Laura Garlisi, M.D.  (Tr. 603-608.)  Lewandowski reported "he has trouble with his knees, fears falling on ice and causing more problem[s] so using a cane."  (Tr. 605.)  On examination, Dr. Garlisi noted he was disheveled and using a cane.  (Tr. 606.)

On March 2, 2015, Lewandowski returned to Ms. Lipnickey for follow-up regarding his groin pain.  (Tr. 594-598.)  She noted he had undergone a scrotal ultrasound, which was unremarkable.  (Tr. 594.)  Ms. Lipnickey was "not convinced" Lewandowski's pain could be explained entirely by epidydimitis.  (Tr. 598.)  She was concerned Lewandowski's pain was the

---

[3] Specifically, the lumbar x-ray revealed as follows: "There is no evidence of fracture or dislocation.  The disc spaces are well preserved.  No spondylolisthesis is seen.  The SI joints are normal."  (Tr. 550.) The results of the x-ray of his left knee were as follows: "There is no evidence of fracture or dislocation.  The joint spaces are well preserved.  No soft tissue swelling, or abnormal calcifications are seen."  (Tr. 551.)

result of nerve damage stemming from his prostrate surgery, and referred him to pain management for a consultation.  (*Id*.)

Lewandowski presented to pain management physician Elias Veizi, M.D., on April 10, 2015.  (Tr. 578-581.)  He complained of low abdominal/pelvic pain, bilateral groin pain, and knee pain.  (Tr. 578.)  Lewandowski rated his pain an 8 on a scale of 10, and indicated it was aggravated by walking, bending, and climbing steps.  (*Id*.)  On examination, Dr. Veizi noted a grossly normal, non-antalgic gait; no muscle atrophy; 5/5 muscle strength in his upper and lower extremities; negative straight leg raise; normal sensation; and limited spinal range of motion "in all planes with only mild discomfort."  (Tr. 579-580.)  Dr. Veizi further observed Lewandowski did not express any pain behaviors during the examination, and could walk on his tip toes and heels. (Tr. 579.)  Dr. Veizi was "not clear at this time as to the origin of" Lewandowski's groin/pelvic pain.  (Tr. 580.)  He prescribed Tramadol and Gabapentin, and referred Lewandowski to physical therapy.  (*Id*.)

On April 29, 2015, Dr. Rizi authored a letter regarding Lewandowski's physical impairments, as follows:

> His main medical issue is prostate cancer he had and since the surgery for this in May 2014 he has had chronic pelvic & testicular pain.  He is followed both by urology and pain management.
>
> Other medical problems are asthma, anxiety, low back pain, hypertension, sleep apnea, [and] dyslipidemia.
>
> I have not specifically evaluated Mr. Lewandowski for his ability to work and therefore can't comment on whether or not he is able to obtain any type of employment.  However with his chronic pelvic and testicular pain and prostate cancer, as well as the need for frequent physician visits and treatment I think it would be extremely difficult for him to secure employment or work at this time.

(Tr. 587-588.)

6

On June 15, 2015, Lewandowski returned to Dr. Boros for a "comprehensive problem evaluation." (Tr. 644-652.) He complained of shoulder, knee, and abdominal pain. (Tr. 644, 646.) Examination revealed moderate abdominal tenderness, normal extremities, normal pulses, normal gait, normal muscle tone, and normal muscle strength. (Tr. 647.) Dr. Boros assessed bilateral knee and shoulder pain, prescribed Gabapentin and Mobic, and ordered blood work. (*Id*.) Lewandowski returned four days later for follow-up regarding his lab work, which showed an elevated A1c level. (Tr. 657.) Dr. Boros prescribed Metformin. (Tr. 658.)

On July 10, 2015, Lewandowski complained of fatigue, headache, body aches, and chronic lower abdominal pain. (Tr. 662-676.) Examination findings were normal, aside from moderate abdominal tenderness. (Tr. 663.) Lewandowski returned the following month, at which time examination revealed moderate abdominal tenderness, as well as pain, painful movement, loss of range of motion, and stiffness in his right knee. (Tr. 678.) Dr. Boros prescribed Prednisone. (*Id*.) Several weeks later, Lewandowski returned to Dr. Boros with complaints of lower abdominal and groin pain. (Tr. 701-705.) Dr. Boros noted that a recent CT of his abdomen/pelvis was normal. (Tr. 701.) He referred Lewandowski to pain management. (Tr. 702.)

On September 1, 2015, Lewandowski established care with pain management physician Teresa Dews, M.D. (Tr. 899-909.) He reported as follows:

> Edward Lewandowski, is a 53 year old year old who presents with abdominal pain and bilateral lower extremity pain. The pain started 1 years ago, following patient had a Prostectomy and is worsening. His pain is located in the middle abdominal region and radiates down anterior thighs ends at the knees and radiates up lateral thigh to lower back and back to the lower quadrant. The pain is described as dull/throbbing and then it will go into a light sharp pain. The pain intensity is rated 8, patient states that his pain ranges from 5-9/10. The pain is exacerbated by prolonged activity, standing and walking and relieved by application of heat and

7

medications - analgesics and NSAIDs. Symptoms interfere with physical activity, work, walking, sitting, bathing, driving, cooking, household cleaning, reaching for shelves and social activities. The patient is significantly functionally impaired and has not been able to work for the past year due to the pain.

(Tr. 899.) Lewandowski complained of night sweats, abdominal pain, heat intolerance, excessive thirst, and muscle pain, but denied gait or balance disturbance. (Tr. 902.) On examination, he was in mild acute distress with labored breathing and abdominal tenderness. (*Id*.) With regard to Lewandowski's back, Dr. Dews noted: "posture and spinal curves are abnormal; flat back, decreased range of motion with reproducible pain, moderate pain to palpation of the lumbar spine with no evidence of spasm or trigger point; straight leg raising test is negative bilaterally." (Tr. 902-903.) Dr. Dews further found normal extremities, 5/5 muscle strength and tone throughout, intact sensation, normal reflexes, and antalgic gait. (Tr. 903.)

Dr. Dews assessed neuralgia, neuritis, and radiculitis, and noted that "diagnoses of ilioinguinal neuralgia of left side and ilioinguinal neuralgia of right side were also pertinent to this visit." (Tr. 904.) She counseled Lewandowski regarding weight loss, diet and exercise; prescribed Topamax; and ordered bilateral ilioinguinal/iliohypogastric nerve blocks with nerve stimulation. (Tr. 904-905.)

Lewandowski returned to Dr. Boros on September 15 and 29, 2015. (Tr. 706-719, 720-721.) He complained of fatigue, lower abdominal pain, and frequent headaches. (*Id*.) On both dates, examination revealed normal gait, normal reflexes, and intact sensation. (Tr. 707, 721.) Dr. Boros ordered blood work and referred Lewandowski to a neurologist. (*Id*.)

On September 28, 2015, Lewandowski returned to Dr. Dews for a nerve block injection. (Tr. 911-918.) In a follow up call the next day, Lewandowski reported he was still experiencing pain, which he rated a 3 on a scale of 10. (Tr. 915.)

8

On October 23, 2015, Lewandowski presented to physician assistant Frank Sajen, P.A., for a Pain Management follow-up evaluation. (Tr. 919-929.) He reported "significant relief of pain 80% with recent bilateral ilioinguinal, genitofemoral nerve block," including a reduction in his low back pain. (Tr. 919.) Examination revealed paraspinal tenderness, normal posture, and normal sensation. (Tr. 921.) Mr. Sajen diagnosed (1) bilateral low back pain with sciatica; (2) abdominal pain; (3) and bilateral chronic knee pain. (*Id*.) He noted Lewandowski had experienced significant relief with injections but "is starting to feel his pain again." (*Id*.) Mr. Sajen continued Lewandowski on his medications and referred him to physical therapy. (*Id*.)

Lewandowski presented for a Physical Therapy Low Back Evaluation on November 17, 2015. (Tr. 754-758.) He reported groin, back and knee pain, which he rated a 7.5 on a scale of 10. (Tr. 754.) Lewandowski indicated his right knee pain was greater than his left, and worsened by prolonged standing. (*Id*.) He reported limitations in his abilities to wash dishes, work, lift and bend. (*Id*.) On examination, physical therapist Rose Solitro, P.T., noted antalgic gait; normal lumbar range of motion; normal muscle strength in Lewandowski's hips, knees, ankles, and toes; normal extremity range of motion, flexibility and joint mobility; normal reflexes and normal sensation. (Tr. 755-756.) She also noted right knee tenderness and pain with climbing stairs and changing positions from sitting to standing. (*Id*.) Ms. Solitro found Lewandowski's prognosis was excellent and recommended eight physical therapy sessions. (Tr. 757.)

On November 30, 2015, Lewandowski returned to Dr. Dews for another nerve block injection. (Tr. 930-937.) Examination revealed pain to palpation in Lewandowski's back and abdomen; normal motor and sensory function in his back; normal extremities; normal spinal

range of motion, intact muscular strength; intact sensation; and negative straight leg raise. (Tr. 932.) Dr. Dews also noted a gait disturbance and stated Lewandowski "intermittently uses a cane." (*Id.*)

On January 8, 2016, Lewandowski returned to physician assistant Mr. Sajen for follow up regarding his bilateral groin pain. (Tr. 938-948.) He reported a 50% reduction in his pain as a result of his nerve block and a 50% increase in his abilities to sit, stand and walk. (Tr. 938.) Lewandowski did continue to report pain, however, rating it a 6 on a scale of 10. (*Id.*) Examination revealed no pain to palpation of the lumbar spine, good lumbar range of motion without reproducible pain, negative straight leg raise bilaterally, normal extremities, intact sensation, and normal gait. (Tr. 941.) Mr. Sajen found Lewandowski was "stable from a pain management standpoint" and continued him on his medications. (Tr. 942.)

Lewandowski presented to Dr. Dews on January 25, 2016 for his third nerve block injection. (Tr. 950-956.) Examination revealed no spinal pain to palpation, normal motor and sensory function, normal extremities, normal spinal range of motion, intact muscular strength, intact sensation, negative straight leg raise bilaterally, and antalgic gait. (Tr. 951.)

On February 26, 2016, Lewandowski reported his bilateral groin pain had improved since the injection, but he continued to suffer from bilateral knee pain. (Tr. 958-967.) He rated his pain a 7 on a scale of 10 and indicated it interfered with physical activity. (Tr. 958.) Examination revealed normal posture and back alignment, bilateral knee pain and painful movement, intact sensation, and antalgic gait. (Tr. 960.) Mr. Sajen found Lewandowski was "currently stable from a pain management standpoint" and continued him on his medications.

(Tr. 961.)  The record reflects Lewandowski underwent a fourth nerve block injection on March 14, 2016.  (Tr. 968-974.)

On March 22, 2016, Lewandowski underwent a MRI of his right knee.  (Tr. 1002-1003.) It revealed: (1) degenerative changes in the posterior horn of the medial meniscus without discrete tear; (2) small areas of predominantly high grade (>50% thickness) cartilage loss/fissuring in the patella and trochlea with smaller areas of full thickness cartilage loss/fissuring; (3) normal muscle bulk and signal intensity; and (4) small joint effusion.  (*Id*.)

Lewandowski returned to Mr. Sajen on May 2, 2016.  (Tr. 975-980.)  He reported his pain had increased over the last two weeks, rating it a 7 on a scale of 10.  (Tr. 975.)  Examination revealed bilateral knee pain and painful movement, difficulty moving from sitting to standing, and "antalgic gait, with cane." (Tr. 977.)  Mr. Sajen noted that Lewandowski had recently had bilateral knee injections and is "starting to notice some improvement." (*Id*.)  He continued him on his medications. (Tr. 977-978.)

Lewandowski presented to Dr. Boros on July 8 and 25, 2016.  (Tr. 1005-1010, 1011-1014.)  At the latter of these visits, Lewandowski complained of left shoulder pain and decreased range of motion.  (Tr. 1011.)  Examination revealed limited range of motion and pain to palpation in his shoulder.  (*Id*.)  Dr. Boros prescribed a Medrol DosePak.  (*Id*.)

On August 24, 2016, Lewandowski returned to Mr. Sajen for follow-up regarding his bilateral groin and pelvic pain.  (Tr. 1016-1024.)  He reported his pain was stable and his functionality was unchanged.  (Tr. 1016.)  Examination revealed normal extremities, normal reflexes, and an "antalgic gait, with cane." (Tr. 1018.)

11

Finally, on August 30, 2016, Lewandowski returned to Dr. Boros for "evaluation for disability." (Tr. 1026-1031.) Dr. Boros noted Lewandowski suffered from chronic lower abdominal and inguinal pain, as well as severe osteoarthritis in his bilateral knees. (Tr. 1026.) Examination revealed moderate abdominal tenderness; bilateral knee pain and loss of knee range of motion; knee stiffness and painful movement; pain with palpation to Lewandowski's bilateral groin muscles; and normal pulses. (Tr. 1027.) Dr. Boros prescribed Mobic for his chronic knee pain, and Zoloft for treatment of depression.[4] (*Id.*)

## C. State Agency Reports

On February 25, 2015, Lewandowski underwent a physical consultative examination with Adi Gerblich, M.D. (Tr. 553-559.) Lewandowski reported a history of epididymitis, asthma, obstructive sleep apnea, hypertension, and tinnitus. (Tr. 553.) He also complained of knee and back pain, stating he could only walk one block or climb one flight of stairs before experiencing knee pain. (Tr. 554.) On examination, Dr. Gerblich noted normal breathing sounds, no edema, normal back, normal Babinski's, normal upper and lower body muscle powers, normal hand grasp and manipulation, and normal joint range of motion. (*Id.*) He also

---

[4] In her Brief on the Merits, the Commissioner cites medical evidence regarding Lewandowski's physical impairments that she states was submitted to the Appeals Council. (Doc. No. 14 at 9-11, citing Tr. 34-119.) As the Appeals Council denied review, it is well established that this Court's review is limited to the record and evidence before the ALJ. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.2001); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich.2003); *Fink v. Comm'r of Soc. Sec.*, 2013 WL 3336579 at fn 5 (N.D. Ohio June 25, 2013). Lewandowski does not argue this evidence was submitted to the ALJ prior to his decision, nor does he cite or discuss this evidence in his briefing before this Court. Thus, the Court will not recount or consider this additional medical evidence, located at Tr. 34- 119.

noted that Lewandowski walked with a cane and "with a slow gait." (*Id.*)  Dr. Gerblich opined, summarily, that Lewandowski had "no limitation for sedentary activity."  (Tr. 555.)

On March 17, 2015, state agency physician Venkatachala Sreenivas, M.D., reviewed Lewandowski's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 159-160.)  Dr. Sreenivas found Lewandowski could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight hour work day; and sit for about six hours in an eight hour workday.  (*Id.*)  He further concluded Lewandowski had an unlimited capacity to push/pull and could frequently balance, occasionally stoop, kneel, crouch, and climb ramps/stairs, and never climb ladders/ropes/scaffolds.  (*Id.*)  Lastly, Dr. Sreenivas found Lewandowski should avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation; and avoid all exposure to hazards such as machinery and unprotected heights.  (*Id.*)

On May 27, 2015, state agency physician Stephen Sutherland, M.D., reviewed Lewandowski's medical records and completed a Physical RFC Assessment.  (Tr. 172-173.)  Dr. Sutherland reached the same conclusions as Dr. Sreenivas.[5]  (*Id.*)

**D.     Hearing Testimony**

During the September 9, 2016 hearing, Lewandowski testified to the following:

---

[5] In addition, on January 27, 2015 and May 30, 2015 respectively, state agency psychologists Aracelis Rivera, Psy.D., and Carl Tischler, Ph.D., reviewed Lewandowski's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 157, 170.) Both Drs. Rivera and Tischler determined Lewandowski had only mild limitations in his activities of daily living, social functioning, and concentration, persistence, and pace.  (*Id.*)  They concluded Lewandowksi's "pyschological impairment is not severe enough to significantly limit work activity." (*Id.*)

- He lives in a one-story house with his fiancé. (Tr. 138.) Prior to his onset date, he worked as a casting operator and material handler. (Tr. 130.) In both positions, he lifted up to or over 100 pounds. (Tr. 140-142.)

- In April 2014, he was diagnosed with prostrate cancer. (Tr. 124.) He subsequently underwent robotic surgery, which resulted in nerve damage to his groin. (Tr. 124-125.) This nerve damage causes shooting pain and is triggered by twisting, bending, and lifting. (*Id.*) He also has a tear in his knee and suffers from knee pain. (Tr. 127-128.) His pain level at the time of the hearing was a 7 out of 10. (Tr. 126.)

- He sees a pain management physician and has undergone nerve block injections. (Tr. 126, 133-134.) The injections provide relief for about 3 to 4 months, but do not completely eliminate the pain. (*Id.*) They allow him to "move a little bit better" than without the injections. (Tr. 126.)

- He was using a cane at the hearing because his right knee "is pretty torn up." (Tr. 124.) His primary care doctor recommended he use a cane. (Tr. 133.) He had been using a cane for about a year the time of the hearing. (Tr. 124.)

- His pain affects his ability to stand, walk, and lift. (Tr. 125, 131.) He can lift about 15 pounds. (Tr. 125.) He can stand/walk for about 15 minutes before needing a break. (Tr. 132.) He can sit for about 45 minutes before needing to change positions. (Tr. 133.) He can generally bend over, but has difficulty squatting. (Tr. 129, 131.)

- On a typical day, he cleans up, washes the dishes, vacuums the house, walks the dog, and then rests for awhile before cooking dinner. (Tr. 127, 132.) He generally "relaxes most of the day." (*Id.*) He mows his lawn with a riding mower, and uses a push mower to do the trim. (Tr. 138.)

- He also suffers from tinnitus, sleep apnea, asthma, and PTSD. (Tr. 127-129, 136.) His PTSD affects his sleep and concentration. (Tr. 136-137.) It causes him to overthink things, and worry too much. (Tr. 137.) He pretty much stays to himself and stated he has "gone back into a shell." (Tr. 139.)

The VE testified Lewandowski had past work as a centrifugal casting machine tender (medium performed as heavy, SVP 2), and material handler (heavy, SVP 3). (Tr. 141-142.) The ALJ then posed the following hypothetical question:

Hypothetical Number 1, this person is male, 54 years of age, high school education, same work background as Mr. Lewandowski. This first person can lift

14

and carry 20 pounds occasionally, 10 pounds frequently. Can stand, walk six out of eight. Can sit six out of eight. No limit on push, pull or foot petal. This person can occasionally use a ramp or stairs. Never a ladder, rope or a scaffold. Can frequently balance, occasionally stoop, kneel and crouch but never crawl. No manipulative or visual limitations. Hearing is frequent. Speaking is constant. This person should avoid high concentrations of heat, cold, humidity, noise,[6] smoke, fumes, pollutants and dust and must avoid entirely dangerous machinery and unprotected heights. This person can do simple and complex tasks and I'm including running a car as a complex task. And the equivalent mental capabilities needed to successfully perform that function. However, the task should be less stress and by that I mean no high production quotas, no piece rate work, no work involving arbitration, confrontation, negotiation or supervision and that's it.

(Tr. 142-143.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as cashier II (light, SVP 2), mail clerk (light, SVP 2), and delivery marker (light, SVP 2). (Tr. 143-144.)

The ALJ then asked a second hypothetical that was the same as the first, but limited the hypothetical individual to standing and walking for only four hours in an eight hour workday. (Tr. 144.) The VE testified the hypothetical individual would be able to perform the previously identified jobs of mail clerk (light, SVP 2), and delivery marker (light, SVP 2), as well as the job of ticket seller (light, SVP 2). (Tr. 144.)

Finally, the ALJ asked the VE to consider the second hypothetical with the additional limitation that "this person would use a cane when standing or walking in the non-dominant left hand." (Tr. 144.) The VE testified this limitation would eliminate employment because "the individual would essentially have only one hand to work with when they're standing to work and that would be half their day." (Tr. 144-145.)

---

[6] The ALJ later clarified that the hypothetical individual was limited to moderate noise; i.e., "nothing over 70 decibels." (Tr. 143.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Lewandowski was insured on his alleged disability onset date, April 15, 2014, and remained insured through March 31, 2018, his date last insured ("DLI.") (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Lewandowski must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2.   The claimant has not engaged in substantial gainful activity since April 15, 2014, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.   The claimant has the following severe impairments: history of prostate cancer; obstructive sleep apnea; tinnitus; asthma; hypertension; degenerative joint disease of the bilateral knees; lumbago; obesity; generalized anxiety

disorder; post-traumatic stress disorder; and affective disorder (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can stand or walk up to four hours total out of an eight-hour work day; can lift and carry 20 pounds occasionally and 10 pounds frequently; can sit up to six hours total out of an eight-hour work day; can occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can frequently balance; can occasionally stoop, kneel, or crouch; can never crawl; can frequently perform tasks requiring hearing and can work in environments with moderate, but not loud, noises; he should avoid concentrated exposure to heat, cold, humidity, smoke, fumes, pollutants, and dusts; he should avoid exposure to dangerous machinery and unprotected heights; and he can perform simple and complex tasks (for example, driving a car), but such tasks should be low stress in that there can be no high production quotas or piece-rate work and no work involving arbitration, confrontation, negotiation, or supervision.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on July ** 1962 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of*

19

*Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

***RFC– Use of a Cane***

In his first assignment of error, Lewandowski argues remand is required because the ALJ failed to properly consider his need for a cane in determining he is capable of light work. (Doc. No. 12 at 8.) He maintains "it is well settled by the evidence that Plaintiff requires a cane to ambulate," citing treatment records documenting antalgic gait and use of a cane. (*Id*. at 8-9.) Lewandowski also cites his hearing testimony that Dr. Boros prescribed a cane for ambulation. (*Id.* at 9) (citing Tr. 133.) He maintains his use of a cane renders him incapable of the standing, walking, and lifting requirements associated with light work. (*Id.* at 8-9.)

The Commissioner maintains substantial evidence supports the ALJ's decision to exclude use of a cane from the RFC. (Doc. No. 14 at 13-16.) She argues the "record does not support Plaintiff's allegation that he had a medical need for a cane," noting there is no evidence that Dr. Boros prescribed one and arguing "there simply is no medical documentation establishing the need for a cane and describing the circumstances for which it is needed" as required by Social Security Ruling 96-9p, 1996 WL 374185 (SSA July 2, 1996). (*Id*. at 14.) The Commissioner also asserts that "throughout the record [Lewandowski's] gait was normal; no gait abnormalities were noted; he did not have a cane or other assistive device; and he had normal muscle strength, sensation, and reflexes." (*Id*. at 15.) Thus, the Commissioner argues substantial evidence supports the ALJ's decision not to include any limitations in the RFC based on the use of a cane.

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).[7]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

---

[7] This regulation has been superseded for claims filed on or after March 27, 2017.  As Lewandowski's applications were filed in November 2014 and March 2015, this Court applies the rules and regulations in effect at that time.

Here, the ALJ determined, at step two, that Lewandowski suffered from the severe impairments of history of prostate cancer, obstructive sleep apnea, tinnitus, asthma, hypertension, degenerative joint disease of the bilateral knees, lumbago, obesity, generalized anxiety disorder, post-traumatic stress disorder, and affective disorder. (Tr. 12.) After determining Lewandowski's impairments did not meet or equal the requirements of a Listing at step three, the ALJ proceeded to consider the medical evidence regarding his physical impairments at step four. (Tr. 13-21.) The ALJ first acknowledged Lewandowski's testimony that he experiences pain with certain activities (including twisting, bending, lifting, and climbing stairs), and uses a cane for ambulation. (Tr. 17.) The ALJ found, however, that Lewandowski's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence. (*Id.*) With regard to Lewandowski's prostate cancer and residual symptoms, the ALJ found the "evidence tends to indicate that these symptoms have been manageable with treatment," including nerve blocks that have resulted in significant pain relief. (*Id.*) The ALJ noted that physical examinations relating to this impairment were largely normal, including normal gait. (*Id.*)

The ALJ then discussed the medical evidence regarding Lewandowski's back and knee pain, as follows:

> The claimant has been treated throughout the period at issue for back and knee pain. He at least initially reported needing medication for this pain only two to three times per week. (Exhibit 2F:42). Imaging of the lumbar spine has been within normal limits. (Exhibit 3F:2, 5F:6). X-rays of the bilateral knees were normal. (Exhibits 3F:3, 5F:8). An MRI of the right knee showed some degenerative changes but was without major acute damage. (Exhibit 11F:2). The claimant reported that he had injured his knee in 1994, about 20 years before he stopped working. (Exhibit 4F:3). He indicated that his knee pain arose mostly with climbing stairs rather than normal ambulation. (Exhibit 5F:18). He was occasionally observed with a slow or slightly antalgic gait, but overall his gait was,

for the most part, grossly normal and non-antalgic. (Exhibits 4F:2, 5F:19, 7F:5). He reported using a cane due for precautionary reasons due to fear of falling on ice. (Exhibit 5F:45). Physical examinations of the back were largely within normal limits with only some decreased range of motion and "only mild discomfort." (e.g. Exhibit 5F:20). Physical examinations of the knees noted only some painful decreased range of motion and stiffness. (Exhibit 12F:24). He underwent physical therapy for back pain and also reported improvement after the nerve blocks he received for his cancer-related pain. (Exhibit 7F, 9F:24). He received injections on at least one occasion and reported that they were helpful. (Exhibit 9F:82).

(Tr. 18.)

The ALJ then considered the opinion evidence, according only "partial weight" to the opinion of consultative examiner Dr. Gerblich that Lewandowski had "no limitation for sedentary activity" because "it is not clear that the sedentary exertional level is the most that the claimant is capable of; rather, it appears to overcompensate for the claimant's limitations in order to avoid exacerbations and further non-exertional limitations." (Tr. 19.) The ALJ then accorded "little weight" to Dr. Rizi's opinion that it would be "extremely difficult" for Lewandowski to work on the grounds that her opinion was speculative and did not constitute a medical opinion of Lewandowski's "function-by-function capabilities and limitations." (*Id*.) Lastly, the ALJ accorded "some weight" to the opinions of state agency physicians Drs. Sreenivas and Sutherland. (Tr. 20.) The ALJ explained these physicians' opinions "largely appropriately accommodate the claimant's impairments overall;" however, "later-received records, particularly the claimant's MRI and more recent treatment notes demonstrating a slight downturn in the claimant's ability to ambulate, indicate that a further limitation on standing and walking is appropriate." (*Id*.)

The ALJ concluded by explaining as follows:

In sum, the above residual functional capacity assessment is supported by treatment records demonstrating that, for the most part, the claimant's impairments

have been chronic, in some cases for many decades, and have not significantly
limited the claimant's ability to work. To accommodate pain due to cancer and
treatment, as well as back and knee pain, the claimant is limited to light work
except standing and walking for only four hours total. It should be noted that this
exertional capacity is consistent with the claimant's testimony that he could lift 15
pounds. The postural limitations accommodate the claimant's cancer-related pain
as well as knee and back pain and are consistent with his reports regarding using
a cane for balance, having knee pain when climbing stairs, and his testimony that
he was not completely precluded from bending or kneeling. He is afforded
limitations on noise levels due to long-standing tinnitus. Environmental limitations
are assigned to prevent asthma exacerbations. He is precluded from exposure to
hazards due to side effects of pain medications as well as any fatigue arising from
sleep apnea. Finally, mental limitations are afforded in light of the claimant's
anxiety, worries,
and difficulties coping with stress.

(Tr. 21.)  The ALJ formulated the following RFC: "After careful consideration of the entire

record, I find that the claimant has the residual functional capacity to perform light work[8] as

defined in 20 CFR  404.1567(b) and 416.967(b) except he can stand or walk up to four hours

total out of an eight-hour work day; can lift and carry 20 pounds occasionally and 10 pounds

frequently; can sit up to six hours total out of an eight-hour work day; can occasionally climb

ramps or stairs; can never climb ladders, ropes, or scaffolds; can frequently balance; can

occasionally stoop, kneel, or crouch; can never crawl; can frequently perform tasks requiring

hearing and can work in environments with moderate, but not loud, noises; he should avoid

_____

[8] "Light work" is defined as follows: "Light work involves lifting no more than 20
pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.
Even though the weight lifted may be very little, a job is in this category when it requires
a good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls. To be considered capable of performing
a full or wide range of light work, you must have the ability to do substantially all of
these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that
"since frequent lifting or carrying requires being on one's feet up to two-thirds of a
workday, the full range of light work requires standing or walking, off or on, for a total of
approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

concentrated exposure to heat, cold, humidity, smoke, fumes, pollutants, and dusts; he should avoid exposure to dangerous machinery and unprotected heights; and he can perform simple and complex tasks (for example, driving a car), but such tasks should be low stress in that there can be no high production quotas or piece-rate work and no work involving arbitration, confrontation, negotiation, or supervision." (Tr. 16.)

For the following reasons, the Court finds the RFC is supported by substantial evidence. As the Commissioner correctly notes, Social Security Ruling 96-9p addresses the issue of hand-held assistive devices, as follows:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). "If a cane is not medically necessary, it cannot be considered a restriction or limitation on the plaintiff's ability to work, *Carreon v. Massanari*, 51 Fed. Appx. 571, 575 (6th Cir. 2002), and the administrative law judge is not required to reduce the claimant's RFC accordingly." *Lowe v. Comm'r of Soc. Sec*., 2016 WL 3397428 at * 6 (S.D. Ohio June 21, 2016) (citing *Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). "[S]ubjective complaints do not amount to medical documentation" establishing the need for a cane. *Grimes v. Berryhill*, 2018 WL 2305723 at * 5 (E.D. Tenn. April 19, 2018).

Here, Lewandowski cites his hearing testimony as evidence of his need for a cane. As noted above, Lewandowski testified during the hearing that he had been using a cane for "about a year" because his right knee was "pretty torn up," and his doctor recommended he use it. (Tr.

26

124, 133.)  However, Lewandowski's testimony, standing alone, does not qualify as "medical documentation establishing the need" for the cane under SSR 96–9p.  *See, e.g., Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 3738270 at * 12 (N.D. Ohio July 29, 2014) (finding claimant's testimony that he needs a cane does not qualify as "medical documentation establishing the need" for a cane under SSR 96-9p); *Smith v. Astrue*, 2012 WL 4329007 (M.D. Tenn. July 16, 2012) (finding claimant's testimony regarding her need for a cane did not count as "medical documentation establishing the need [for the cane], and a description of circumstances of when it is needed.").  Significantly, Lewandowski has not directed this Court's attention to any evidence that he was prescribed a cane by a medical professional during the insured period of disability nor has he cited any medical records in which his physicians stated that a cane was needed or described the circumstances under which a cane was medically necessary.  *See also Grimes*, 2018 WL 2305723 at * 5; *Whayne v. Comm'r of Soc. Sec.*, 2018 WL 1256237 at * 3-4 (E.D. Mich. March 12, 2018).

In addition to his own testimony, Lewandowski cites various treatment notes to establish his need for a cane, each of which note antalgic gait and use of a cane at medical appointments. (Doc. No. 12 at 9, citing Tr. 553, 554, 903, 932, 938, 960, 977, 1018, 1026-1027.)  However, viewing the medical record as a whole, the Court finds substantial evidence supports the ALJ's determination that Lewandowski's treatment records do not warrant the inclusion of limitations regarding the use of a cane in the RFC.  As noted above, the ALJ acknowledged  Lewandowski's testimony that he used a cane and was "occasionally observed with a slow or slightly antalgic gait."  (Tr. 18.)  The ALJ concluded, however, that "overall, his gait was, for the most part,

grossly normal and non-antalgic." (*Id.*)  As discussed below, this finding is supported by substantial evidence in the record.

In most cases, treatment records failed to note any gait disturbance or use of a cane, and objective testing was largely normal.  For example, in September 2014 (several months after his April 2014 onset date), Lewandowski was documented as having normal spinal range of motion, intact strength, no joint tenderness, and normal extremities.  (Tr. 311.)  This treatment record did not record either antalgic gait or use of a cane.  (*Id.*)  Treatment notes from Dr. Rizi in November 2014 and Physician Assistant Lipnickey in January 2015 also failed to note any gait disturbance or use of a cane.  (Tr. 491, 619.)  A series of knee and lumbar x-rays from February 2015 were normal.  (Tr. 550-551, 565-568.)  Normal, non-antalgic gait and normal muscle strength were expressly noted in treatment records from April 2015, June 2015, September 2015, and January 2016.  (Tr. 579-580, 647, 706-719, 720-721, 941.)  An MRI of Lewandowski's right knee from March 2016 showed some cartilage loss, but otherwise failed to show any acute damage.  (Tr. 1002-1003.)  Treatment records from Dr. Boros in July 2016 and August 2016 did not record either antalgic gait or use of a cane.  (Tr. 1005-1010, 1011-1014, 1027.)

The first mention of a cane is in February 2015, when psychiatrist Dr. Garlisi and consultative examiner Dr. Gerblich each noted Lewandowski walked with a cane.  (Tr. 554.)  Nine months later, in November 2015, Dr. Dews noted Lewandowski's "intermittent use of a cane." (Tr. 932.)  Over six months later, in May 2016 and August 2016, Mr. Sajen noted (without further elaboration) that Lewandowski had an "antalgic gait, with cane." (Tr. 977, 1018.)  None of these physicians or medical professionals, however, prescribed Lewandowski a cane, otherwise indicated a cane was necessary, or articulated under what particular

circumstances a cane was necessary.  Moreover, the Court notes that, even on those occasions when Lewandowski did appear with an abnormal gait, he was often not recorded as using a cane. *See e.g,.* Tr. 903, 755-756, 951, 960.  Rather, treatment records suggest that Plaintiff infrequently used a cane and such use was discretionary.  "Simply because Plaintiff may have been 'using a cane at various times,' does not mean the ALJ was required to include it in Plaintiff's RFC." *Forester v. Comm'r of Soc. Sec.,* 2017 WL 4769006, at *4 (S.D. Ohio Oct. 23, 2017).  *See also Grimes*, 2018 WL 2305723 at * 7.

Accordingly, and in light of the above, the Court finds substantial evidence supports the ALJ's decision not to include limitations relating to use of a cane in the RFC.  *See, e.g., Carreon v. Massanari,* 51 Fed. Appx.  571, 575, 2002 WL 31654581 (6th Cir.2002) ("Because the cane was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work.")  *See also Mitchell*, 2014 WL 3738270 at * 13 ("As there is no medical documentation establishing that Mitchell required the use of a cane and describing the circumstances when it is needed, the ALJ did not err by omitting the use of a cane from his hypothetical questions to the vocational expert"); *Strain v. Comm'r of Soc. Sec. Admin*., 2013 WL 3947160 (N.D. Ohio Aug.1, 2013) (upholding the ALJ's RFC determination excluding use of a cane where no objective medical evidence supported use of a cane); *Murphy v. Astrue*, 2013 WL 829316 at *7 (M.D. Tenn. Mar.6, 2013) (finding ALJ did not err in omitting use of cane in the VE hypothetical where cane was not prescribed by a physician and use of cane was not supported by the objective medical evidence); *Austin v. Comm'r of Soc. Sec*., 2010 WL 1170625 at * 11 (N.D. Ohio Jan.29, 2010) (where documented evidence did not reflect that plaintiff need cane to stand or ambulate, ALJ was not required to include cane usage in RFC).

Lewandowski's first assignment of error is without merit.

***Consultative examiner Dr. Gerblich***

Lewandowksi next argues the ALJ erred in affording only "partial weight" to the opinion of consultative examiner Dr. Gerblich that Lewandowski has "no limitation for sedentary work."[9]  (Doc. No. 12 at 10-11.)  He maintains the ALJ failed to articulate "good reasons" for rejecting Dr. Gerblich's opinion, arguing "Dr. Gerblich's opinion is reliable as it relates to the most that Plaintiff is physically capable of."  (*Id*.)  Lewandowski further asserts that Dr. Gerblich's opinion is "wholly supported by the weight of the evidence, including objective diagnostic testing and examination findings."  (*Id*.)

The Commissioner argues Lewandowski's argument is without merit because "the opinions of consultative examiners are not subject to the same 'good reasons' requirements as treating physicians."  (Doc. No. 14 at 16.)  She maintains the ALJ properly analyzed and evaluated Dr. Gerblich's opinion and articulated several reasons for according it only partial weight.  (*Id*. at 17.)  The Commissioner asserts substantial evidence supports the ALJ's finding. (*Id*. at 17-18.)

In formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings [made by federal or state agency consultants], but they must consider this evidence . . . because our Federal or State agency medical and psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 CFR § 404.1513a (b)(1).  When doing

_____

[9]  At one point in his Brief, Lewandowski states "the ALJ failed to properly consider opinion of both treating and consultative physicians." (Doc. No. 12 at 7.)  However, Lewandowski confines his argument to the ALJ's weighing of Dr. Gerblich's opinion, and raises no specific argument that the ALJ improperly rejected the opinion of a treating physician in the instant case.  Accordingly, the Court deems any such argument waived.

so, an ALJ will consider several factors "in deciding the weight we give to any medical opinion," including, the nature and duration of the relationship, the supportability and consistency of the opinion, specialization, and other factors such as "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record." 20 C.F.R. § 404.1527(c). Finally, an ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 CFR § 404.1527(f)(2).

It is well established that an ALJ must give "good reasons" for the weight given to a treating physician's opinion. *See e.g., Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir.2007) ("Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits."). However, the Sixth Circuit has made clear that, with regard to non-treating, but examining sources such as Dr. Gerblich, "the agency will simply '[g]enerally [ ] give more weight to the opinion of a source who examined [the claimant] than to the opinion of a source who has not examined'" him. *Ealy*, 594 F.3d at 514. Notably, the procedural "good reasons" requirement does not apply to non-treating physicians. *See Smith*, 482 F.3d at 876 (explaining that "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports"); *Roche v. Berryhill*, 2017 WL 6512236 at * 25 (N.D. Ohio Dec. 12, 2017); *Boughner v. Comm'r of Soc. Sec.*, 2017 WL

2539839 at * 14 (N.D. Ohio May 22, 2017); *Taylor v. Colvin*, 2013 WL 6162527 at * 16 (N.D. Ohio Nov. 22, 2013).

Here, Lewandowski underwent a physical consultative examination with Dr. Gerblich on February 25, 2015. (Tr. 553-559.) Lewandowski reported a history of epididymitis, asthma, obstructive sleep apnea, hypertension, and tinnitus. (Tr. 553.) He also complained of knee and back pain, stating he could only walk one block or climb one flight of stairs before experiencing knee pain. (Tr. 554.) On examination, Dr. Gerblich noted normal breathing sounds, no edema, normal back, normal Babinski's, normal upper and lower body muscle powers, normal hand grasp and manipulation, and normal joint range of motion. (*Id.*) He also noted that Lewandowski walked with a cane and "with a slow gait." (*Id.*) Dr. Gerblich opined, summarily and without further explanation, that Lewandowski had "no limitation for sedentary activity." (Tr. 555.)

The ALJ assessed Dr. Gerblich's opinion, as follows:

> As for the opinion evidence, partial weight is afforded to the opinion of the consultative examiner, Adi Gerblich, MD. (Exhibit 4F). Dr. Gerblich opined that the claimant had "no limitation for sedentary activity." This finding appears to be consistent with the claimant's subjective reports of pain, dyspnea with exertion, and problems lifting. It is consistent with Dr. Gerblich's observation of the claimant's slow gait. However, it does not appear to fully encapsulate postural and environmental limitations that would be expected to arise from the claimant's musculoskeletal and respiratory impairments. Further, it is not clear that the sedentary exertional level is the most that the claimant is capable of; rather, it appears to overcompensate for the claimant's limitations in order to avoid exacerbations and further non-exertional limitations. For these reasons, this opinion is given only partial weight.

(Tr. 19.)

The Court finds the ALJ properly evaluated Dr. Gerblich's opinion. As an initial matter, Dr. Gerblich examined Lewandowski on only one occasion and, therefore, does not constitute a

treating physician for purposes of social security regulations. Accordingly, the ALJ was not required to articulate "good reasons" for affording only partial weight to his opinion. *See Smith*, 482 F.3d at 876; *Roche*, 2017 WL 6512236 at * 25; *Boughner,* 2017 WL 2539839 at * 14; *Taylor*, 2013 WL 6162527 at *16. Here, the ALJ acknowledged Dr. Gerblich's opinion, correctly described his findings, and explained the basis for his decision to accord the opinion only partial weight. Specifically, the ALJ concluded that "it is not clear that the sedentary exertional level is the most that the claimant is capable of." (Tr. 19.) The Court finds this reason to be supported by substantial evidence in the record.

As the ALJ noted earlier in his decision, treatment records indicate Lewandowski's pelvic and groin pain was "manageable with treatment," including nerve blocks that resulted in significant pain relief. (Tr. 17.) This finding is supported by substantial evidence in the record. As noted *supra*, Lewandowski consistently complained of abdominal and groin pain during the relevant period but reported notable pain relief after receiving nerve block injections beginning in September 2015. Specifically, in October 2015, Lewandowski reported "significant relief of pain 80% with recent bilateral ilioinguinal, genitofemoral nerve block," including a reduction in his low back pain. (Tr. 919.) In January 2016, after receiving his second injection, he reported a 50% reduction in his pain and a 50% increase in his abilities to sit, stand and walk. (Tr. 938.) The following month, he continued to report improvement as a result of his injections. (Tr. 958-961.)

With regard to his back and knee pain, the ALJ noted that imaging of Lewandowski's lumbar spine and knees was normal, physical examination findings were largely benign, and Lewandowski reported pain relief with knee injections. (Tr. 18.) These findings are also

33

supported by substantial evidence.  Knee and lumbar x-rays from February 2015 were normal, and an MRI of Lewandowski's right knee from March 2016 showed some cartilage loss but otherwise failed to show any acute findings.  (Tr. 550-551, 565-568, 1002-1003.)  Moreover, as discussed above, treatment records frequently (although not always) recorded normal physical examination findings, including normal spinal range of motion, 5/5 muscle strength, no joint tenderness, no edema, normal extremities, no muscle atrophy, negative straight leg raise, normal sensation, and normal pulses.  (Tr. 311, 619, 579-580, 647,  663, 706-719, 720-721, 941, 951.)  Normal, non-antalgic gait was also expressly noted in treatment records from April 2015, June 2015, September 2015, and January 2016.  (Tr. 579-580, 647, 706-719, 720-721, 941.)  Treatment records from Dr. Boros in July 2016 and August 2016 did not record either antalgic gait or use of a cane.  (Tr. 1005-1010, 1011-1014, 1027.)  Finally, as the ALJ noted, treatment records reflect that Lewandowski underwent bilateral knee injections and reported some improvement as a result.  (Tr. 977.)

In light of the above, the Court finds substantial evidence supports the ALJ's conclusion that Dr. Gerblich's opinion was only entitled to "partial weight" because "it is not clear that the sedentary exertional level is the most that the claimant is capable of."  (Tr. 19.)  The ALJ acknowledged Dr. Gerblich's opinion and articulated his basis for discounting it.  The analysis provided by the ALJ is sufficient to satisfy the explanation requirements for non-treating, examining physicians, and is supported by substantial evidence.

Accordingly, it is recommended the Court find the ALJ did not err in according only "partial weight" to Dr. Gerblich's opinion regarding Lewandowski's physical functional limitations.  This assignment of error is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


 _s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 7, 2019